UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION, AT CINCINNATI

| | | |
|---|---|---|
| **BRUCE GIBSON** | : | **Case No. :** |
| **Plaintiff,** | : | |
| v. | : | |
| | : | |
| **UNUM LIFE INSURANCE COMPANY OF AMERICA** | : | |
| | : | |
| **Defendant.** | : | |

## COMPLAINT

Plaintiff, Bruce Gibson, for his Complaint against the Defendant, Unum Life Insurance Company of America, states as follows:

### Jurisdiction/Venue

1. This is an action arising under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001, et seq., to recover benefits due under employee benefit plans, to clarify the Plaintiff's rights to future benefits under such plans, and to recover attorneys' fees and costs.

2. This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

3. Venue is properly in this District in that the breaches took place in this District and Unum resides or may be found in this District.

### FACTUAL ALLEGATIONS

**1. Plaintiff's Participation In The Plan**

4. Plaintiff Mr. Gibson worked for the Boston Beer Company, at the Samual Adams facility in Cincinnati, Ohio as a Packaging Operator at all relevant times.

5. Plaintiff's occupation was a "heavy" duty occupation in that it required lifting up to 50 pounds for up to 33% of the day, walking and standing constantly, and twisting constantly.

6. While employed by Boston Beer Company, Plaintiff was a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7), in the long-term disability and life insurance policies sponsored by Boston Beer Company, under policy number 131717.

7. At all relevant times, the Plan provides for LTD Benefits and Life Insurance benefits; and Life Insurance Premiums are waived while a participant is disabled. The Plan is and was an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

8. At all relevant times, Unum is and has been the claims administrator of the Plan within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. § 1002(16)(A).

9. At all relevant times, Unum has been a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

10. Upon information and belief, Unum is both the claims adjudicator and the claims payor, and operates under a conflict of interest.

**2. The LTD Plan**

11. Under the Plan, "Disabled" is defined as

> You are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
> You have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to

2

perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

12. The Plan specifically permits, and incentives, participants to obtain part-time or reduced work while being "Disabled" under the Plan to supplement their income.

13. For instance, the Plan defines "Gainful Occupation" as follows: an occupation that is or can be expected to provide you will an income within 12 months of your return to work, that exceeds: 80% of your indexed monthly earnings, if you are working; or 60% of your indexed monthly earnings, if you are not working.

14. In addition, under the Rehabilitation and Return to Work Assistance Program, your combined LTD benefits and work earnings can equal up to 110% of your indexed pre-disability earnings.

15. The Plan also states that if participants earn less than 20% of their indexed pre-disability income while "Disabled", they receive their full, unreduced monthly LTD Benefit.

16. If the participant earns between 20% and 80% of their indexed pre-disability income, they remain Disabled under the Plan. The amount of their LTD benefits will not be reduced for the first 12 months that they work while disabled, and thereafter the LTD benefit is reduced by the percent of income the participant is losing due to his disability.

**3. Plaintiff Becomes Disabled Under the Plan.**

17. Plaintiff had to stop working as a Packaging Operator in August 2016 due to bilateral knee osteoarthritis and multiple knee surgeries, including bilateral knee replacements, osteoarthritis in his elbow, and lumbar sacroiliitis and lumbar sacral radiculopathy.

18. As a result of Plaintiff's conditions, he experiences constant knee and ankle pain, antalgic gait, and instability if walking or standing for more than 10 minutes at a time, as well as low back pain, hip pain and elbow pain.

19. His conditions are permanent and lifelong and treatment options such as injections and ablations and analgesic pain medication do not adequately control Plaintiff's pain.

20. Unum approved Plaintiff's short-term disability claim and thereafter approved his long-term disability benefit claim under the Plan beginning in or around February 2017.

21. Unum determined the Plaintiff was continuously totally disabled from his own occupation from approximately February 2017 until February 2019, when the Plan's definition of disability changed.

22. Thereafter, Unum found Plaintiff disabled from "any occupation" from approximately February 2019 onward.

23. Unum believed Plaintiff was qualified to received Social Security Disability benefits and paid a third-party vendor to assist Plaintiff with the SSD application process.

24. In or around March 9, 2019 Plaintiff was notified that his claim for Social Security Disability benefits was approved. Unum received payment the "overpayment" resulting from the past-due SSD benefit award through its relationship with the third-party vendor it paid to represent Plaintiff.

25. Unum further benefits from the SSD benefit award because Plaintiff's monthly LTD benefits are offset by the monthly SSD benefit, reducing the total amount it pays Plaintiff out of its own reserves each month from March 2019 forward.

26. Shortly after Plaintiff's SSD benefit was approved and Unum was reimbursed for the "overpayment", Unum began surveilling Plaintiff to confirm whether he used his cane "90% of the time" as he had reported.

27. Unum's surveillance in 2021 uncovered nothing supportive of a denial of benefits.

28. In October 2021 Umum performed a vocational analysis and concluded entry level sedentary occupations would not provide a gainful wage.

29. In October 2021, Unum found that Plaintiff "does not have capacity to perform the demands" of a sedentary occupation "on a consistent/sustained basis due to consistent reports of ongoing bilateral knee pain, cane use, intensity of treatment, and no inconsistent activity findings".

30. Unum further concluded that although the Plaintiff had lost some weight due to a gastric bypass surgery, Plaintiff continued to have elevated BMI and the weight loss did not improve his pain.

31. Unum determined that the nature and extent of Plaintiff's conditions were permanent and justified offering to buy him out of on-going monthly benefits.

32. In January and February 2022 Unum offered to pay Plaintiff over $45,000 as settlement of his future LTD benefits, Plaintiff did not accept.

**4. Unum Arbitrarily Denies Plaintiff's LTD Claim**

33. Plaintiff's combined Social Security Disability and reduced LTD benefits were insufficient for Plaintiff to pay for necessities such as food, medical bills, and lodging for himself and his children.

34. In April 2022 Plaintiff called Unum to ask if he could attempt to earn a limited part-time income while continuing to earn LTD benefits.

35. The Policy not only allows, but incentivizes participants to attempt to return to work, even if in a part-time role.

36. In the call with Unum, Plaintiff said he was not sure he could even get back to work part-time yet, but was looking at a reduced role that would entail delivering parts a few hours a day for 2-3 days a week "to get out of the house".

37. Unum advised Plaintiff in the April 2022 call that the Policy did allow for return to work on a part-time basis.

38. In July 2022 Plaintiff informed Unum he was "having difficulty" with increased pain, but had to work part time (delivering parts) in order to make ends meet.

39. In accordance with the Plan terms and Unum's request, Plaintiff timely provided Unum with accurate information regarding his part-time employment and other income. He explained to Unum in a call in July 2022 that he found a part-time job scheduled for up to 20 hours a week earning $10/hour delivering parts, but he could call off or reduce his hours as needed depending on symptoms. The job was modified for Plaintiff specifically and required less than sedentary capacity.

40. In order for Plaintiff to be able to work in a "Gainful Occupation" Unum determined he would have to be able to earn $3,378.66/month on a sustained basis in 2022.

41. Plaintiff earned approximately $800/month in 2022.

42. In August 2022 Unum ordered surveillance on Plaintiff, which reported that Plaintiff was seen walking for approximately 10 minutes total and carrying one small package weighing less than 5 pounds. Specifically, the surveillance reportedly saw him perform the following activities:

43. On day 1 he was seen walking from a parking lot to a store at 1:10 PM, exiting the store at 1:21 pm, driving 7 minutes to a different location and walking from the parking lot to the store at 1:28 pm and leaving at the same time. He was seen driving for 6 more minutes, parking, and walking into the store and leaving immediately. From 1:34 until 5:15 pm, Bruce did not drive any further or do any more walking. He was not seen until 5:15 when he drove home. For that day, Bruce walked for less than 5 minutes and sat in his car to drive for less than 15 minutes. On the

6

next day, he was allegedly seen leaving the parking lot at 12:02 pm, driving for 10 minutes, walk from the parking lot to the inside of the store, immediately drive back to the store for 8 minutes. On the second day he was observed driving for less than 20 minutes and walking for less than 5 minutes.

44. The written surveillance report excludes any reference to the fact that Plaintiff walks with an antalgic gait or that the parking lot distance is less than 100 feet.

45. Unum concocted an irrational and arbitrary basis to deny Plaintiff's claim for continued LTD benefits in a letter dated November 11, 2022, concluding that his weight loss and surveillance showing he did not use a cane while walking for less than 5 minutes meant that he could work in a full time occupation lifting up to 20 pounds for up to 2.5 hours a day, five days a week; lifting up to 10 pounds for up to 5.5 hours a day, five days a week; sit constantly for up to 8 hours a day, and walk for an indeterminate amount of time.

46. Unum relied on the surveillance footage and its own conflicted, in-house medical consultants who disregarded voluminous medical recording containing objective medical findings documenting the extent of Plaintiff's limitations as well as Unum's own internal findings.

47. For instance, although Unum previously noted that Plaintiff's weight loss did not provide the necessary pain relief he needed to work in gainful employment, Unum's conflicted and biased medical reviewers concluded his weight loss served as a reason to deny benefits.

48. In addition, Unum and its conflicted and biased medical consultants/reviewers arbitrarily concluded his activity levels in the surveillance footage were inconsistent with his reported limitations because he was seen walking 100 feet without a cane. But Unum disregarded the fact that he walked with an antalgic gait at all times, and that the surveillance footage did not conflict with his reports of cane use when walking for 10 minutes or more at a time.

49. Despite already finding that entry level sedentary occupations would not be gainful for the Plaintiff and despite Unum concluding Plaintiff could not perform light duty occupations as that term is defined by Unum and by the Department of Labor, Unum arbitrarily and capriciously concluded Plaintiff could perform various light duty occupations in its denial letter.

50. Unum also denied Plaintiff's request to waive life insurance premiums due to his disability.

51. Unum's denial letters failed to meet the requirements set forth in the Department of Labor's claim regulations. For instance, it failed to

   a. Provide a sufficient rational for the denial;

   b. Explain its reasons for disagreeing with Plaintiff's doctors;

   c. State what information it reviewed and/or relied upon; and

   d. Explain what information was necessary to perfect his claim, and why that information was necessary.

52. Plaintiff timely appealed the denial of LTD benefits and waiver of life insurance premiums and included hundreds of pages of additional medical records supporting Plaintiff's continued disability, as well as records contradicting Unum's reasons for denying his claim. Plaintiff's appeal is attached as Exhibit A.

53. Unum referred Plaintiff's file to its in-house medical director, Dr. Green, who is regularly found to provide arbitrary, capricious, biased, and inaccurate opinions on Unum's behalf.

54. Although Unum has the right to require Plaintiff to undergo an in-person examination, Unum opted against having him evaluated in person and instead chose to send his file to Dr. Green,

8

known to Unum to consistently provide arbitrary, capricious, biased, and inaccurate opinions on Unum's behalf.

55. Plaintiff submitted additional information responding to Dr. Green's biased and arbitrary opinion, but Unum denied Plaintiff's claim again.

56. Unum's June 6, 2023 appeal denial constitutes a final appeal determination and Plaintiff has exhausted all administrative remedies available to him.

**5. Unum's Long History Of Bias**

57. Throughout this claim, the heavily biased nature of Unum's approach is clear in its extensive use of its own medical directors and consultants, namely Dr. Green, to review the Plaintiff's medical records. These medical directors and consultants are Unum employees, who are compensated in a manner designed to encourage them to deny claims, rather than treat them to a full and fair review.

58. Unfortunately, this is not surprising. Dr. Patrick McSharry, an in-house consultant hired to work at Unum's Chattanooga claims department, described in deposition the culture and focus behind Unum's medical review process.

59. In his deposition, Dr. McSharry explained that the role of in-house medical consultants was to write reports so that claims personnel could deny claims. Claims personnel were viewed as the "business partners" of the in-house medical staff.

60. Medical consultants were not to provide independent evaluations. Rather, they were given bonuses and stock option incentives tied to Unum's profitability. Their job was to make their "business partners" happy by supporting denials and enabling them to meet their target number of claims recovered from obligated payment.

61. Dr. McSharry was repeatedly criticized for expressing his actual medical opinion instead of opinions that the claims department wanted to hear. He described a claims department that had a policy of denial by any means necessary. Dr. McSharry's warnings do not exist in isolation.

62. Unum was the subject of substantial criticism and review in 2002-2004 for improper claims handling processes. A Multistate Market Conduct Examination was performed "to determine if Unum's disability income claims handling practices reflected systemic unfair claim settlement practices in violation of state laws governing the insurance industry."

63. After conducting a review of Unum's files, the multistate examination identified the following areas of concern:

   a. Excessive reliance upon in-house medical professionals;

   b. Unfair construction of attending physician or IME reports;

   c. Failure to evaluate the totality of the claimant's medical conditions; and

   d. Inappropriate burden placed on claimants to justify eligibility for benefits . . . in which benefits were denied by the Companies on grounds that the claimant failed to provide "objective evidence" of a disabling condition.

64. The multistate investigation was resolved in November 2004. Unum agreed to comply with the terms of a Regulatory Settlement Agreement which required, among other things, that Unum increase its use of IMEs rather than relying so heavily on the opinions of its own employed medical directors and consultants. It has failed to do so here.

65. Unum's denial was made without substantial supporting evidence. Its decision to terminate the Plaintiff's claim was instead based on its own biased findings despite of a wealth of well-documented medical and testimonial evidence to the contrary. At all material times, Unum was acting on behalf of the Plan and in its own capacity as the Insurer and Claims Administrator.

66. Unum's decision-making process at both the initial and appellate level as outlined in the Plan did not provide a reasonable opportunity to the Plaintiff for a full and fair review of the decision denying the claim, as is required by 29 U.S.C. §1133 and 29 C.F.R. 2560.503-1.

67. Unum's denial decision was arbitrary and capricious. Alternatively, it was *de novo* wrong.

## **Claim For Relief**
## **(ERISA §502(a)(1)(B))**

68. Plaintiff incorporates all prior allegations as if fully set forth herein.

69. Unum's denials constitute a breach of its obligation under the Plan and ERISA to pay LTD benefits to Plaintiff and waive his life insurance premiums, and Plaintiff has exhausted all administrative remedies set forth in the Plan and required by ERISA.

70. Unum's repeated refusal to consider information submitted with Plaintiff's claims and appeals constitute a breach of its obligations under the Plan and ERISA.

71. Unum's refusal to reinstate Plaintiff to the Plan or pay his benefits after reversing its denial decision constitutes a breach of its obligations under the Plan and ERISA.

72. Unum's denial of continued benefits and internal claims procedures outlined above constitutes unreasonable claim procedures, a breach of its obligations under the ERISA, the Plan, and the Claim Regulations and arbitrary and capricious denial of benefits.

73. Unum's reliance on information it considered when finding Plaintiff totally disabled from Any Occupation in order to deny his claim, without any improvement in Plaintiff's conditions is wrong, unsupported by the evidence, and arbitrary and capricious.

74. It is Unum's burden to prove that *de novo* review is not applicable in this matter.

11

75. Even if the Plan grants sufficient discretionary authority to Unum, this Court should review the decision to terminate Plaintiff's claim for LTD benefits under a *de novo* standard of review because Unum failed to follow applicable ERISA regulations, the Plan's requirements and terms, and its own policies and procedures, and because Plaintiff was denied a full and fair review.

76. Alternatively, the denial of Plaintiff's LTD benefits and waiver of life insurance premiums was wrongful, arbitrary, and capricious, and not the product of a deliberate principled reasoning process, including Unum's wrongful disregard of the medical evidence and opinions of Plaintiff's own treating physicians; its inconsistent and irrational reliance on a third party file reviewer to deny benefits; relying on the medical opinions of conflicted and biased file reviewer, which conflicts with Plaintiff's treating physicians and Unum's own internal clinical review; failing to follow its own policies and procedures; refusing to consider all available information Plaintiff submitted with his claims and appeals; denying Plaintiff a full and fair review; wrongfully relying on a flawed and biased record for review.

77. Plaintiff is entitled to discovery to probe and ascertain the issues of procedural due process and conflict of interest and bias under which Unum reviewed and failed to properly adjudicate Plaintiff's claims for benefits and to complete the Administrative Record.

78. Plaintiff was and continues to be disabled as defined under the Plan.

79. As a result of the foregoing, Plaintiff has suffered losses in the form of unpaid benefits of an amount to be determined from approximately November 2022 to present, and continuing for as long as he remains disabled under the Plan or until his normal retirement age.

80. Plaintiff is entitled to a judgment against Defendant in the amount of the unpaid benefits under the Plan, as well as an order requiring the Plan to pay benefits to him for as long as he

remains disabled under the Plan, and reinstate him to the life insurance plan and LTD Plan. Mr. Cook is further entitled to prejudgment and post judgment interest and an award of attorneys' fees and costs under ERISA § 502(g) in an amount to be proven.

WHEREFORE, Plaintiff requests the Court grant him the following relief from Defendant, Unum Life Insurance Company:

a) a judgment in the amount of all his past-due benefits under the Plan;

b) an order requiring the Defendants and/or the Plan to pay him benefits for as long as he remains disabled;

c) reinstatement to the Life Insurance plan with a waiver of all premiums;

d) his costs and attorney's fees; and

e) all other relief to which he is entitled, including a *de novo* review of the decision to deny the claim.

Dated: October 25, 2023

s/ Claire W. Bushorn Danzl
Claire W. Bushorn (OH Bar No: 0087167)
**THE BUSHORN FIRM, LLC**
810 Sycamore Street
Cincinnati, Ohio 45202
513.827.5771 – phone
513.725.1148 – fax
cbushorn@thebushornfirm.com
*Trial Attorney for Plaintiff*
